Gabriela Dubrocq (Bar No. 24146391)
gd@patillaw.com
**PATIL LAW, P.C.**
300 S. Doheny Drive, Suite 200
Los Angeles, California 90048
Phone Number: (800) 950-6553

Attorneys for Plaintiffs
THE TAPPING SOLUTION, LLC,
NICOLAS ORTNER, JESSICA ORTNER,
AND ALEJANDRO ORTNER

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

THE TAPPING SOLUTION, LLC, a Connecticut limited liability company, NICOLAS ORTNER, an individual, JESSICA ORTNER, an individual, and ALEJANDRO ORTNER, an individual,

*Plaintiffs*,

v.

ARK WEALTH MANAGEMENT, LLC DBA ARK FINANCIAL, a Texas limited liability company; ARK FINANCIAL CONSULTANTS, LLC, a Texas limited liability company; ARK FINANCIAL ADVISORS, LLC, a Texas limited liability company; and DAVID JAMES BULL, an individual,

*Defendants*.

**Case No.: 1:25-cv-2169**

**ORIGINAL COMPLAINT FOR:**

**(1) Violations of Sections 206(1) and 206(2) of the Advisers Act;**
**(2) Violations of Sections 207 of the Advisers Act;**
**(3) Violations of the Texas Securities Act;**
**(4) Breach of Contract;**
**(5) Negligence;**
**(6) Fraud and Fraudulent Misrepresentation; and**
**(7) Breach of Fiduciary Duty**

**DEMAND OF JURY TRIAL**

Plaintiffs The Tapping Solution, LLC, Nicolas Ortner, Jessica Ortner, and Alejandro Ortner (collectively "Plaintiffs") file this Original Complaint against Defendants Ark Wealth Management, LLC, Ark Financial Consultants, LLC, Ark Financial Advisors, LLC, and David

James Bull (collectively, "Defendants") and in support thereof, allege as follows:

## INTRODUCTION

1. This case concerns a breach of fiduciary duty by registered investment advisers. Defendants Ark Wealth Management, LLC ("Ark") and David James Bull ("Bull") are investment advisers registered with the State of Texas and the U.S. Securities and Exchange Commission ("SEC"). As investment advisers, Defendants owe their clients, who they routinely charge hefty advisory fees, a fiduciary duty to act with care, loyalty, fairness, and good faith. This fiduciary duty is based on equitable common law principles and serves as the core of the entire adviser-client relationship. Through their actions, Defendants breached that duty.

2. The fiduciary duty that investment advisers owe to their clients require advisers "to adopt the principal's goals, objectives, and ends;" meaning that the adviser must, at all times, serve the best interest of its clients and not subordinate its clients' interests to its own. Investment advisers must also eliminate or make full and fair disclosures of all conflicts of interest which might incline them, either consciously or unconsciously, to render advice that is not disinterested such that the client can provide full informed consent as to the conflict.

3. From May 2018 through, approximately, June 2025 (the "Relevant Period"), Bull and the investment adviser firms and entities he controls (including their affiliates and predecessors-in-interest), charged Plaintiffs hundreds of thousands of dollars for their purported "transparent" advisory services while engaging in a pattern of deceptive conduct.

4. Despite wearing different hats and operating under different names and affiliated entities, *i.e.*, Ark Financial Advisors, LLC; Ark Financial Consultants, LLC; Ark Insurance Group, LLC; Ark Financial Holdings, LLC (collectively, the "Ark Entities")—Ark is generally known to the public and its customers simply as *Ark* or *Ark Financial*, regardless of the specific

entity name used during their interactions.

5. Public disclosures show that the Ark Entities share a common factor: Bull is consistently listed as the sole owner, majority member, or otherwise controlling person of most, if not all, of the Ark Entities.

6. Defendant Ark, an investment adviser firm registered with the SEC, offers wealth management, tax strategy, estate planning, risk management, and investment advisory services to its customers. Ark targets entrepreneurs and small businesses such as Plaintiffs. Ark claims in its own website that it "operate(s) on a flat-fee model because [it] believe(s) in transparency[;] no surprises, no hidden fees—just straightforward, client-centered service."[1] Ark's purported "values," that the firm markets to its customers, are allegedly built on the notion of "trustworthiness & transparency."[2] However, these purported values and claims are false.

7. The Ark Entities operated at all relevant times as a single, integrated business enterprise under common ownership and control. The Ark Entities shared branding, websites, email domains, marketing materials, personnel, management, client relationships, and revenue streams, and held themselves out to Plaintiffs and the public as a unified advisory platform known as "Ark" or "Ark Financial."

8. Each entity within the Ark Entities acted as the agent, alter ego, and instrumentality of the others with respect to the advisory, consulting, compensation, and investment activities alleged herein. The Ark Entities commingled functions and treated the entities interchangeably in their dealings with Plaintiffs. Accordingly, the Ark Entities are jointly and severally liable for the acts, omissions, and undisclosed compensation arrangements

---

[1] ARK FINANCIAL, https://arkfinancial.com/about-us/ (last visited November 12, 2025).

[2] *Id.*

described in this Complaint.

9. Throughout the Relevant Period, Defendants exploited their professional relationship with Plaintiffs, a growing family-owned business. Defendants solicited Plaintiffs through direct communication and marketing materials that contained false, incomplete, or misleading information, to invest in securities not in their best interests—all while charging hundreds of thousands of dollars in advisory and management fees. Defendants utterly failed to disclose glaring conflicts of interest and compensation arrangements they received from third parties in connection with these recommendations. Defendants also concealed from Plaintiffs undisclosed referral fees from these third parties for steering Plaintiffs to these companies to be signed up as new customers.

10. Not only did Defendants conceal from Plaintiffs all potential conflicts of interest and the financial incentives they, and the various Ark Entities, received in connection with their recommendations to Plaintiffs, but they also filed material misleading public disclosures with the SEC.

11. Through their actions, as more detailed in this Complaint, Defendants breached their own purported values and the fiduciary duty they owed to Plaintiffs as investment advisers. Defendants' actions, or omissions, arise to a breach of duty of care and duty of loyalty they owed to Plaintiffs. Defendants' conduct also violated Texas statutory law and applicable common law principles.

12. As a result of their fraudulent conduct and breaches of fiduciary duty to their advisory clients, including Plaintiffs, Defendants have violated federal and state laws. Plaintiffs therefore seek (1) to order Defendants to pay disgorgement of any ill-gotten gains plus prejudgment interest and (2) to recover damages and other relief for the harm Defendants have

inflicted on Plaintiffs.

## PARTIES

13. Plaintiff The Tapping Solution, LLC is a Connecticut limited liability company with its principal place of business at 39 Beverly Dr., Brookfield, Connecticut. TTS is a family-owned business founded by three siblings, Nick Ortner, Jessica Ortner, and Alejandro Ortner (collectively, the "Ortner Family") in 2007.

14. Plaintiff Nicolas Ortner ("Nick"), age 47, is a resident of Newtown, Connecticut. Along with his siblings, Jessica and Alex, Nick founded TTS and currently serves as the company's chief executive officer.

15. Plaintiff Jessica Ortner ("Jessica"), age 40, is a resident of Newtown, Connecticut. Jessica is a co-founder and part owner of TTS and currently serves as chief content officer.

16. Plaintiff Alejandro Ortner ("Alex"), age 44, is a resident of Newtown, Connecticut. Alex is a co-founder and part owner of TTS and currently serves as the company's chief marketing officer.

17. Defendant Ark is a Texas limited liability company headquartered in Austin, Texas. Ark is an investment adviser firm registered with the SEC (CRD # 317264/SEC# 801-123029). Ark is owned, wholly or in part, by Ark Financial Holdings, LLC, a Texas limited liability company with its principal place of business at 4213 Brady Ridge Dr., Cedar Park, Texas. On information and belief, Ark Financial Holdings, LLC is owned and controlled by Defendant Bull and functions as a holding and control vehicle within the Ark Entities.

18. Defendant Bull is an individual residing in Austin, Texas. Bull is the owner and chief compliance officer of Ark. On information and belief, Bull is also the sole owner, part owner, or controlling person of Ark Financial Advisors, LLC, Ark Financial Consultants, LLC,

Ark Insurance Group, LLC, and Ark Financial Holdings, LLC, each of which operated as part of the Ark Entities. Bull holds himself out to the public as the "founder and CEO of Ark." Bull has been registered as an investment adviser since 2015 (CRD # 5776975) and holds a Series 65 securities license.

19. Defendant Ark Financial Consultants, LLC ("Ark Consultants"), is a Texas limited liability company with its principal place of business at 3520 Executive Center Dr., Suite 124, Austin, Texas. Public records show that Ark Consultants was registered with the Office of the State of Texas in 2017 under the management of its two members, Bull and Jeffrey Socha. At all relevant times, Ark Consultants operated as part of the Ark advisory platform and participated in the advisory, consulting, compensation, and investment activities described in this Complaint, including receiving undisclosed consulting and referral compensation tied to Plaintiffs' investments.

20. Defendant Ark Financial Advisors, LLC ("Ark Financial Advisors") is a Texas limited liability company with its principal place of business in or around Austin, Texas. On information and belief, Ark Financial Advisors is owned or controlled, directly or indirectly, by Bull and Ark Financial Holdings, LLC. At all relevant times, Ark Financial Advisors operated as part of the Ark advisory platform and participated in, and benefitted from, the advisory, compensation, and investment activities described herein, including the receipt of undisclosed compensation tied to Plaintiffs' accounts.

## **RELEVANT NON-PARTY**

21. Non-Party Jonathan Joseph Billiot ("Billiot") is an individual residing in Austin, Texas and registered investment adviser since 2016 (CRD #6681317). Billiot has been registered as a representative of Ark since 2017. Ark's website lists Billiot as a Family Office

Director.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the parties are diverse and Plaintiffs' claim exceeds $75,000, exclusive of interest and costs.

23. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367. References to the Investment Advisers Act of 1940 (the "Advisers Act") in this Complaint are asserted as duty-defining standards and factual predicates to Plaintiffs' state-law claims and equitable remedies, and are not asserted as an independent basis for federal-question jurisdiction.

24. Defendants are subject to the personal jurisdiction of this Court because they conduct business in Texas; the acts, misrepresentations, and omissions occurred in Texas; and because under the Family Office Legacy Agreement between Plaintiff TTS and Defendant Ark, Defendants expressly consented to the exclusive jurisdiction of this Court.

25. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims in this Complaint occurred in the Western District of Texas and Defendants' principal place of business or residence is located in Austin, Texas. Venue is also proper because, under the Family Office Legacy Agreement, Defendant Ark expressly consented to venue in the state and federal courts located within the Western District of Texas, Austin Division.

## FACTUAL BACKGROUND

26. The Ortner Family founded TTS in 2007 for the purpose of providing the public with a holistic healing technique designed to release stress and find balance in their lives. Since

its inception, TTS has helped thousands of people across the world with releasing stress, anxiety, and post-traumatic stress disorder through their different tapping techniques and app.

27. Ark is an investment adviser firm registered since January 2022. However, Ark's website states that Bull founded the firm in 2013. The firm primarily markets its advisory, wealth, and tax services to entrepreneurs and business owners such as Plaintiffs. As of the date of this Complaint, Ark has reported having discretionary assets under management of $191,000,000 across 539 accounts, mostly owned by individual retail investors.

28. At all relevant times, Ark and Bull were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11), as each were engaged in the business of providing investment advice to customers. Throughout the Relevant Period, Bull was also an investment adviser due to his ownership, management, or control of Ark and some, if not all, of the Ark Entities.

29. In the words of Ark's Chief Investment Officer[3] and Bull himself,[4] the firm represents that its services are "based in [an] ethical approach—fully client centered [] without any outside influence" and grounded in "doing what's right, operating with incredible integrity." Yet, contrary to these professed values, Defendants engaged in conduct that serves as the antithesis of "integrity," by concealing from their clients, including Plaintiffs, more than $400,000 in undisclosed fees and commissions they received from third parties.

30. In May 2018, the Ortner Family was introduced to *Ark Financial* and Bull through a referral. During their initial meeting, the firm marketed its services as high-level financial advice for entrepreneurs. They promised Plaintiffs sophisticated wealth management and tax-advantaged strategy services. During this meeting, the firm represented to the Ortner

---

[3] ARK FINANCIAL, https://arkfinancial.com/investment-advisory/ (last visited November 12, 2025).

[4] ARK FINANCIAL, https://arkfinancial.com/about-us/ (last visited November 12, 2025).

Family that they were fiduciaries and would always act in their best interests. It was at this time that TTS entered into an initial services agreement with Ark's predecessor-in-interest or affiliate, Ark Consultants, under which Ark Consultants would provide financial, tax, and wealth consulting services to TTS in exchange for an initial flat fee of $12,500 and a monthly retainer of $2,000.

31. The initial agreement was subsequently terminated on May 22, 2023, at Ark Consultants' request, after the firm went through an internal ownership structure—which on information and belief—involved a fall out between Bull and his former business partner, Jeffrey Socha.

32. On the following day, TTS entered into a second advisory agreement, this time with Ark. Under the new advisory agreement known as the Family Office Legacy Agreement, TTS would continue paying Ark the $2,000 monthly retainer, in addition to a series of new fees, including wealth management fees at a rate of 0.25% to 1% of the assets under management and potential hourly fees—despite Ark's ADV Form omitting that the firm charged hourly fees as part of its compensation structure.

33. The terms of the Family Office Legacy Agreement also mentioned that a "Family Captain," who would serve as TTS's designated trusted advisor, owed a fiduciary duty to TTS and would not be allowed to receive any financial incentives that could potentially influence his or her advice.

34. Notwithstanding the internal legal restructuring that led Ark to terminate the initial agreement, and the existence of multiple affiliates and related entities under which *Ark Financial* operated (and still operates), the firm continued using the same website (https://arkfinancial.com/) and the same email signature block in its communications with

customers, masking any changes in its corporate structure.

[redacted]
Ark Financial
[redacted]
10800 Pecan Park Blvd, Ste 100
Austin, TX 78750
O: 512.660.5703 | [redacted]

(Ark' ng as Ark Wealth Management, LLC.)

[redacted]

3520 Executive Center Drive, Suite 124
Austin, TX 78731

O: 512.660.5703 | [redacted] | M: 512.434.0723

(Ark's email signature block *before* Family Office Legacy Agreement.)

35. The only noticeable change between Ark's email signature block after TTS transitioned into the Family Office Legacy Agreement was an updated business address, while all other elements, including the firm's brand name and contact information remained identical.

**A. Defendants and their registered representatives steered Plaintiffs into unsuitable investments through material misrepresentations and omissions, all while charging Plaintiffs hundreds of thousands of dollars in fees**

36. During the Relevant Period, Defendants or the Ark Entities charged Plaintiffs almost $200,000 in connection with their purported advisory services. These fees did not include any commissions, referral fees, or consulting fees that Defendants or the Ark Entities received from third parties, in connection with the investments they recommended to Plaintiffs and for referring Plaintiffs to third-party companies as new clients.

37. Throughout the Relevant Period, Defendants or the Ark Entities steered Plaintiffs

into unsuitable and/or risky investments not in their best interest. Defendants also failed to disclose to Plaintiffs that either Ark or one of the Ark Entities received commissions or consulting fees in connection with their recommendations—despite being required to do so under their own public disclosures.

***The Legacy Investments***

38. On information and belief, in 2018, Bull and Billiot pitched and sold to each member of the Ortner Family an alternative private placement investment known as the Legacy Investments sponsored by Sixty West, a Missouri company specialized in the acquisition, financing, and development of real estate-related investments.

39. Defendants pitched the Legacy Investments as part of their "tax-advantaged strategy" plan and represented that the Legacy Investments and Sixty West were fully vetted and IRS-compliant.

40. Defendants reassured the Ortner Family that the investment was IRS-approved and was a conservative and safe strategy investment with a low risk. Defendants further explained that the Legacy Investments, which were structured as conservation easements, offered tax-advantages to investors in the form of charitable deductions.

41. On or about May 2018, during an in-person meeting in Austin, Texas, Billiot, acting on behalf of Ark, represented to Nick Ortner that the Legacy Investments were "IRS-approved," "low-risk," and "fully vetted," and that Ark was acting as a "conflict-free fiduciary." In July 2018, during follow-up calls and emails, Bull reiterated that the Legacy Investments were "conservative" and "tax-advantaged" and failed to disclose that Ark and its affiliated entities would receive compensation tied to the investments. These statements were materially false because, at the time they were made, Defendants and affiliated Ark Entities had already

entered into compensation arrangements with the Legacy Investment sponsors and stood to receive substantial undisclosed consulting and referral fees.

42. Following Defendants' recommendations and assurances, the Ortner Family then invested a total of $147,000 in the Legacy Investments. The issuer or sponsor of the Legacy Investments then spread the Ortner Family's funds across several LLCs created with the purpose of acquiring and donating land to claim tax deductions.

43. Unbeknownst to Plaintiffs at the time, Ark or at least one of Ark Entities, had received that same year from the Legacy Investments' sponsors or issuers approximately $385,000 in consulting fees for promoting, recommending, and selling such investments to customers of the firm.

44. However, after claiming tax deductions in connection with their ownership in the Legacy Investments, in 2020 the IRS notified the Ortner Family that it was auditing at least one of the charitable deductions. Specifically, the IRS informed the Ortner Family that it was auditing the $6,506,000 charitable deduction claimed by Athens Oconee School, LLC and Peachtree Historic TCI, LLC. Nick then immediately provided the audit notice to Billiot, who downplayed the significance of the situation, reassuring the Ortner Family there was nothing to fear because these "type of investments" are scrutinized heavily and have nearly a 100% audit rate.

45. The IRS then initiated legal proceedings against these LLCs, in which the Ortner Family held direct membership interests as a result of their investments in the Legacy Investments.

46. Between 2020 and 2025, the Ortner Family routinely turned to Defendants and Billiot for advice on how to navigate the IRS audit, how to complete voting forms and other

required documentation, and how to address their ongoing obligations tied to the Legacy Investments.

47. On September 22, 2025, Judge Jeffrey S. Arbeit from the United States Tax Court issued a decision on the ongoing legal proceeding against Athens Oconee School, LLC and Peachtree Historic TCI, LLC. In that decision, the court found that the charitable deduction claimed by the LLCs was grossly overstated and should have been limited to $25,000 instead of over $6 million. The court determined that this adjustment resulted in an imputed underpayment of $2,273,362 and imposed a 10% accuracy-related penalty for gross evaluation misstatement under I.R.C § 6662(h).

48. The court's determination confirmed that the Legacy Investments exposed the Ortner Family to significant pending tax liabilities and penalties; risks that Defendants and Billiot never disclosed and expressly downplayed.

49. Other LLCs in which the Legacy Investments placed the Ortner Family's funds are also currently under IRS audit.

50. At all relevant times, Defendants understood that receipt of undisclosed compensation from Sixty West or any of their related entities and agents, would create a conflict of interest that would impair their objectivity when making advisory recommendations to their customers.

51. As a direct result of Defendants' misconduct, Plaintiffs now face substantial and time-sensitive tax liabilities, including significant IRS penalties, accumulated interest, and ongoing audit exposure.

***The Life Insurance Policies***

52. Throughout the Relevant Period, Ark or the Ark Entities also pitched and sold at

least two life insurance policies issued by Pacific Life Insurance ("PacLife") to TTS and Nick, in his individual capacity. At the time, Nick was in his early forties, relatively young and not in need of the type of life-insurance structure that Defendants were promoting, especially when he already had appropriate term life insurance coverage. Nevertheless, Defendants pushed these policies over and over again to TTS and the Ortner Family when more appropriate investment options would have better aligned with their financial needs and objectives.

53. Similarly to the Legacy Investments, Defendants pitched the life insurance policies as part of their "tax-advantaged strategy" plan.

54. And just as in the case of the Legacy Investments, Defendants failed to disclose to Plaintiffs more than $70,000 in commissions they received, or the Ark Entities received, from Pacific Life Insurance in connection with the sale of such policies.

55. Defendants' (or the Ark Entities') financial incentives from the sale of these policies to TTS and Nick, created conflicts of interest that directly influenced their recommendations.

56. Not content with failing to disclose these commissions, Defendants improperly managed the allocation of the insurance portfolios, causing TTS's and Nick's policies to lose value over time.

57. Ark was tasked with the management of the allocation of the policies, which were supposed to be invested in indexes. However, in 2021 after noticing that at least one of the portfolios had been allocated to fixed income instead, Nick instructed Ark to correct the allocations. Ark assured him that the error would be fixed, but failed to adequately provide PacLife with the proper instructions, which caused the allocations to remain incorrect and the portfolios to decline in value. When Ark's mistake resurfaced, after Nick noticed that the

allocations were never corrected, Ark attempted to shift blame to PacLife rather than acknowledge its own failure.

***Discovery Rule and Fraudulent Concealment***

58. Plaintiffs did not discover, and in the exercise of reasonable diligence could not have discovered, Defendants' undisclosed compensation arrangements, conflicts of interest, and economic participation in the recommended transactions until well after the investments and insurance products were sold. Throughout the advisory relationship, Defendants affirmatively represented that their compensation was limited to flat advisory and asset-based fees and that they operated under a "transparent, conflict-free, fiduciary" model.

59. Defendants further used identical branding, email domains, website platforms, marketing materials, and continuity of personnel across affiliated Ark entities to obscure the existence and role of the related entities that received consulting fees, commissions, and referral payments. Defendants also reassured Plaintiffs during the IRS audit period that the investments were compliant and low-risk and never disclosed that Defendants and their affiliated entities had been paid substantial undisclosed compensation tied to those same transactions.

60. These acts and omissions concealed the true nature of Defendants' financial interests and prevented Plaintiffs from discovering the misconduct despite reasonable diligence and continued reliance on Defendants' fiduciary status. Plaintiffs first learned of the undisclosed compensation only after Defendants were pressed for documentation and explanation, and prior to that time Plaintiffs lacked facts sufficient to place them on inquiry notice. Accordingly, the discovery rule and the doctrine of fraudulent concealment apply and toll all applicable statutes of limitations until the time Plaintiffs reasonably could have discovered Defendants' misconduct.

61. The fiduciary obligations alleged in this Complaint are informed, in part, by the duties imposed on investment advisers under the Advisers Act, including duties of loyalty, full and fair disclosure of conflicts, and the obligation to provide disinterested advice in the client's best interest. Plaintiffs plead Defendants' violations of these duties as standards of conduct and evidence of fiduciary breach under Texas law, and do not seek a private damages remedy under Sections 206 or 207 except to the extent authorized by statute or equity.

**B. Defendants breached their fiduciary duty to Plaintiffs**

62. As investment advisers, Defendants have a fiduciary duty to their advisory clients. As such, Defendants owe their clients an affirmative duty of utmost good faith and duty of care and are required to provide full and fair disclosure of all material facts to their clients. Defendants also have an obligation to employ reasonable care to avoid misleading their clients. Defendants' duty to disclose all material facts includes a duty to tell clients about conflicts of interest, including any monetary and non-monetary benefit received by Defendants, that might incline Defendants to render investment advice that is not disinterested.

63. Defendants breached their fiduciary duty to Plaintiffs by failing to disclose compensation arrangements that incentivized Defendants to recommend and direct client funds into certain investments. Defendants failed to disclose conflicts of interest related to compensation arrangements concerning (i) life insurance purchases; (ii) a consulting agreement with a third-party company for the promotion, development, marketing, and sale of certain investments to clients of Ark; and (iii) referral fees or kickbacks from referring Plaintiffs to unaffiliated companies for external services.

64. In addition to the flat-fee that Defendants charged Plaintiffs for their purported advisory services, Defendants (or the Ark Entities) had undisclosed arrangements with third

parties to receive commissions, consulting fees, and referral fees.

65. Defendants knew, or were reckless in not knowing, that these compensation arrangements created conflicts of interest, and knew, or were reckless in not knowing, that this information was not disclosed to Plaintiffs.

66. Yet, Defendants never disclosed to Plaintiffs the financial incentives they (or any of the Ark Entities) received in connection with their recommendations—despite Ark's own public disclosures stating that the firm was required to provide ***written disclosures*** of such compensation arrangements to its customers.

**i. Defendants failed to disclose conflicts of interest related to the sale of the Legacy Investments to the Ortner Family**

67. Despite only TTS having a formal written agreement with Ark (and its predecessor Ark Consultants), Defendants and their registered representatives, including Billiot, pitched the Legacy Investments to the individual members of the Ortner Family.

68. On information and belief, Ark's predecessor-in-interest or affiliate, Ark Consultants, entered into a Consulting Agreement with Legacy Land Holdings, LLC ("Legacy Holdings") on June 18, 2018, under which, Ark Consultants agreed to provide certain consulting services to Legacy Holdings in exchange for a consulting fee. Under the Consulting Agreement, Ark Consultants would assist Legacy Holdings in the development and marketing of strategy for the raising of equity through the sale of membership interests in various offerings, and to *at a minimum* (i) review and comment on any disclosure documents; (ii) ***identify target market investors***; (iii) ***contact investors and inform them about the advantages of the investments***; (iv) ***inform selected investors about the opportunity, including Legacy Holdings and the investments***; (v) undertake best efforts to schedule and attend scheduled communication with selected investors to educate them regarding the investments; and (vi)

provide ongoing progress reports to Legacy Holdings regarding the above efforts. Once the targeted investors were identified, Ark Consultants was then required to assist them in the preparation and completion of all forms needed to participate in the investments and to continue communicating with the investors about the status of the investments and projects sponsored by Legacy Holdings.

69. Between July 17 and July 25, 2018, Ark's predecessor-in-interest or affiliate, Ark Consultants, received a bank deposit for $153,352.50 from Sixty West and a check for $67,620 from Legacy West, LLC (on information and belief, a related entity of Sixty West and the Legacy Holdings).

70. In December 2018, Ark's predecessor-in-interest or affiliate, Ark Consultants, received at least $165,000 in consulting fees from Legacy Holdings in connection with the firm's consulting services and promotion and sale of investments to clients of the firm. Neither Bull, Billiot, Ark, nor its predecessor or affiliate, Ark Consultants, disclosed these consulting fees to the Ortner Family.

71. In total, Ark or Ark Consultants received approximately $385,972 in "consulting fees" in connection with their promotion and sale of the Legacy Investments to customers of the firm.

72. However, Defendants never disclosed to Plaintiffs the existence, extent, nature, and details of this Consulting Agreement with Legacy Holdings nor the compensation they received in connection with promoting and selling the Legacy Investments to its customers, including Plaintiffs. Defendants' omissions constitute a breach of their fiduciary duty of loyalty, fairness, and good faith.

**ii. Defendants failed to disclose conflicts of interest related to the sale of life insurance policies**

73. Throughout the Relevant Period, Defendants concealed more than $70,000 they received in commissions from PacLife in connection with the sale of the life insurance policies to TTS and Nick, and only acknowledged so after being pressed by Plaintiffs.

74. Defendants knew, or were reckless in not knowing, that these commission arrangements created conflicts of interest, and knew, or were reckless in not knowing, that this information was not disclosed to Plaintiffs—despite Ark's own public disclosures stating that the firm was required to provide ***written disclosures*** of such compensation arrangements to its customers.

**iii. Defendants failed to disclose conflicts of interest related to their referral of Plaintiffs to CCK Strategies**

75. In 2019, Defendants strongly recommended and advised Plaintiffs to engage an unrelated firm known CCK Strategies, PLLC for their tax and CPA services.

76. CCK Strategies is a tax and business consulting firm registered in Tulsa, Oklahoma, with its principal place of business in Frisco, Texas.

77. In or about May 2019, TTS signed a tax services agreement with CCK Strategies.

78. Since their engagement, TTS has paid approximately $250,000 to CCK Strategies for their services.

79. Once again, Defendants failed to disclose, and only did so after being pressed—six years after their original recommendation—that Ark had been paid a 10% referral fee, for a total of approximately $20,009 in connection with TTS' engagement of CCK Strategies.

**C. Defendant Ark made material misrepresentations and omissions in its ADV and Client Relationship Summary (CRS) Forms filed with the SEC**

80. As an investment adviser registered with the SEC, Ark is required to execute and keep their Forms ADV and CRS current and accurate. The Form ADV is a public record that

offers some insights on, *inter alia*, the operations of the firm, their compensation model, management and ownership, and potential conflicts of interest.

81. Ark's ADV and CRS Forms contained misleading and incomplete material information.

82. Ark markets its advisory services to customers based on a flat-fee model, meaning that customers pay a fixed monthly retainer. Under a separate model, Ark could also charge customers based on a percentage of assets under its management (e.g., 1% of the first $1 million; 0.8% of the next $5 million, and so on). These models were reflected in Plaintiffs' service agreements with the firm.

83. At all times, Plaintiffs were under the impression (and were so advised as such by Ark) that the firm would only be compensated for its services under these two compensation models. At no time did Defendants, nor any of their representatives, disclose to Plaintiffs that they could also receive compensation in the form of commissions and other fees for the services offered to their customers.

84. In fact, under the "Compensation Arrangements" of Section 5.E of Ark's ADV Form, Ark publicly disclosed that the firm was only compensated for their investment advisory services based on (1) a percentage of assets under its management and (2) fixed fees. Ark knowingly, or negligently, failed to disclose that the firm (including its affiliates or predecessors) received other forms of compensation, including referral fees, consulting fees, or commissions.

85. Item 3: "Fees, Costs, Conflicts and Standard of Conduct" in Ark's CRS Form briefly mentions that the way that the firm makes money may create conflicts of interest. However, Ark's statement, at best, is vague and unclear for any potential customer who is

unfamiliar with how investment adviser firms operate. Ark's CRS Form directs its readers to items 11 and 14 of its ADV Form Part 2 for more information regarding potential conflicts.

*86.* Item 11: "Recommendations Involving Material Financial Interest" in Ark's ADV Form Part 2, states in part that the firm ***"does not recommend that clients buy or sell any security in which . . . [the firm or any related person of the firm] has a material financial interest."*** Similarly, item 14: "Client Referrals and Other Compensation" in Ark Wealth's ADV Form Part 2, states that the firm ***"may receive compensation from selected third-party advisers via a fee split, but otherwise does not receive any economic benefit from any other third party for advice rendered to [the firm's] clients."*** Ark's public records further stated that although the firm may compensate non-employees for referrals, the firm is ***required to have a written agreement*** with such parties with respect to solicitation activities and referral fees and to provide the referred clients with a ***"disclosure document describing the [referral] arrangement."***

87. At no point did Ark, nor any of its affiliates or predecessors, provide Plaintiffs with any disclosure document, nor any other form of disclosure, describing the referral fees, commissions, or consulting fees they received in connection with their services to Plaintiffs.

88. As Ark's owner and chief executive officer, Bull was involved or should have been involved in the filing of Ark's ADV and CRS Forms. On information and belief, Bull approved the content of the Forms before they were publicly filed, but failed to correct the misrepresentations and omissions therein.

89. Ark's own disclosures painted a misleading and incomplete picture of its compensation structure and conflicts of interest. While publicly claiming that it received no material financial interest or benefits from third parties, in reality, the firm accepted substantial

undisclosed commissions and fees that it failed to disclose to its customers, including Plaintiffs. Ark's ADV and CRS disclosures are materially false and misleading.

**D. Bull's scienter and unreasonable conduct as an investment adviser**

90. At all relevant times, Bull was a person who, for compensation, either directly or through his ownership or control of Ark and the Ark Entities, engaged in the business of advising others on the sale and purchase of securities and management of investment portfolios.

91. On information and belief, during the Relevant Period, Bull was the founder, 50% member or partner (at least), or chief executive officer of Ark and the Ark Entities.

92. On information and belief, Bull has provided, and continues to provide, investment advice to customers of Ark or the Ark Entities.

93. As a registered investment adviser, Bull knew that he had a fiduciary duty to act in the best interests of his clients and to disclose to clients all material information relating to potential conflicts of interest.

94. In spite of that fiduciary duty, Bull knowingly, or recklessly, placed his interests above of his clients', and enriched himself at their expense.

**E. Bull aided and abetted Ark' (and Ark Entities') violations of state and federal laws**

95. On information and belief, Bull provided substantial assistance to Ark's (and Ark Entities') violations of state and federal laws by (1) providing unsuitable recommendations not in the best interest of Plaintiffs; (2) permitting, or making, undisclosed compensation arrangements with third parties; (3) receiving compensation based on those arrangements; and (4) failing to disclose those compensations to Plaintiffs.

96. Defendants' unsuitable recommendations to Plaintiffs and failure to disclose their obvious conflicts of interest were willful, knowing, intentional, or reckless.

**COUNT I**
**VIOLATION OF SECTIONS 206(1) AND 206(2) OF THE ADVISERS ACT**
**(against all Defendants)**

97. Plaintiffs repeat and hereby reallege the allegations above as if fully set forth herein, and allege Defendants' conduct as violations of the duties and standards arising under the Advisers Act for purposes of establishing Defendants' fiduciary obligations and wrongful conduct, and as factual predicates to Plaintiffs' state-law claims and equitable remedies.

98. At all relevant times, Defendants were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Ark and Bull each are in the business of providing investment advice concerning securities for compensation. Bull is also an investment adviser due to his ownership, management, and control of Ark.

99. As detailed in this Complaint, Defendants, by use of the mails or any means of instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly, or recklessly: (a) have employed or are employing devices, schemes, or artifices to defraud clients and/or potential clients; or (b) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

100. Defendants owed a fiduciary duty of utmost good faith, loyalty, and care to provide suitable recommendations to their clients and in their best interest, to make full and fair disclosures to their clients, including any conflicts or potential conflicts of interests, and not to act in Defendants' own interests to the detriment of their clients. Defendants breached their fiduciary duty to Plaintiffs, and engaged in a scheme to violate Sections 206(1) and 206(2) of the Advisers Act.

101. Defendants had a financial incentive to recommend the investments at issue to Plaintiffs and to refer Plaintiffs to third parties for their services.

102. As investment advisers, Defendants are required to act in their clients' best

interests, including making sound investment recommendations. In making investment recommendations and purchases within a customer's account, an investment adviser has a fiduciary duty and obligation to only select suitable investments and strategies.

103. Defendants' investment strategy ignored Plaintiffs' investment objectives. These allegations are asserted as factual predicates and standards of conduct underlying Plaintiffs' state-law claims and equitable remedies, and are not asserted as an independent claim for private damages under the Advisers Act.

104. Bull knowingly or recklessly provided substantial assistance to Ark's (or the Ark Entities') violations.

105. As a result, Bull aided and abetted Ark's (or the Ark Entities') violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

106. To the extent this Court determines that any remedy is available to private litigants under the Advisers Act, Plaintiffs seek only such equitable or rescission-based relief as may be permitted by statute. Plaintiffs otherwise rely on Defendants' Advisers Act violations as predicate facts and legal standards supporting their state-law claims for breach of fiduciary duty, fraud, and related causes of action.

**COUNT II**
**VIOLATION OF SECTIONS 207 OF THE ADVISERS ACT**
**(against all Defendants)**

107. Plaintiffs repeat and hereby reallege the allegations above as if fully set forth herein, and allege Defendants' conduct as violations of the duties and standards arising under the Advisers Act for purposes of establishing Defendants' fiduciary obligations and wrongful conduct, and as factual predicates to Plaintiffs' state-law claims and equitable remedies.

108. Section 207 of the Advisers Act [15 U.S.C. § 80b-7] provides that it is unlawful

for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the SEC under Section 203 of the Advisers Act [15 U.S.C. § 80b-3], or to omit to state in any such application or report any material fact which is required to be stated therein. Rule 204-1 [17 C.F.R. § 275.204-1] promulgated under Section 204 of the Advisers Act [15 U.S.C. § 80b-4] states that each amendment to the Form ADV is a "report" within the meaning of Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

109. As detailed in this Complaint, Defendants willfully or recklessly made untrue material statements or omissions in their public ADV and CRS Forms.

110. Defendants knew or should have known that incorrect and incomplete information contained in the firm's forms could deceive its clients or potential clients. These allegations are asserted as factual predicates and standards of conduct underlying Plaintiffs' state-law claims and equitable remedies, and are not asserted as an independent claim for private damages under the Advisers Act.

111. As a result, Defendants have violated Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

112. Bull knowingly or recklessly provided substantial assistance to Ark's (or the Ark Entities') violations.

113. As a result, Bull aided and abetted Ark's (or the Ark Entities') violations of Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

114. To the extent this Court determines that any remedy is available to private litigants under the Advisers Act, Plaintiffs seek only such equitable or rescission-based relief as may be permitted by statute. Plaintiffs otherwise rely on Defendants' Advisers Act violations as predicate facts and legal standards supporting their state-law claims for breach of fiduciary duty,

fraud, and related causes of action.

**COUNT III**
**VIOLATION OF THE TEXAS SECURITIES ACT**
**(against all Defendants)**

115. Plaintiffs repeat and hereby reallege the allegations above as if fully set forth herein.

116. Defendants Ark Wealth Management, LLC, Ark Financial Consultants, LLC, and Ark Financial Advisors, LLC were not merely recommending the Legacy Investments; they participated directly in the selling process, including identifying investors, soliciting and presenting the opportunity, assisting with execution and subscription documentation, coordinating communications with the issuer, and receiving compensation that was contingent upon investment placement. Defendants' conduct therefore constituted participation in the offer and sale of securities within the meaning of Article 581-33 and, alternatively, Defendants are liable as aiders, abettors, and control persons under Article 581-33(F).

117. The Texas Securities Act provides that "[a] person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." Tex. Rev. Civ. Stat. Ann. art. 581-33(A) (West 2017).

118. Defendants recommended and sold securities to Plaintiffs, including their interests in the Legacy Investments, through untrue or incomplete statements of material facts or by omitting material facts necessary to make the statements made not misleading. These untrue statements and omissions included, but are not limited to:

(1) misrepresenting the nature and risks of the Legacy Investments;

(2) failing to disclose the IRS scrutiny, audit history of conservation easements (despite later acknowledging that these types of investments have an almost 100% guaranteed risk of audit);

(3) failing to disclose the substantial commissions, referral fees, and financial incentives Defendants and the Ark Entities received from third parties; and,

(4) representing that the investments were suitable, tax-advantaged, and aligned with Plaintiffs' objectives when they were not.

119. Defendants' omissions and misrepresentations rendered their statements misleading in light of the circumstances under which they were made. Defendants knew, or should have known, that Plaintiffs were relying on their expertise and fiduciary assurances in evaluating the recommended investments.

120. Bull knowingly or recklessly provided substantial assistance to Ark's (or the Ark Entities') violations of the Texas Securities Act.

121. As a result, Bull aided and abetted Ark's (or the Ark Entities') violations of the Texas Securities Act.

122. Plaintiffs have suffered damages as a direct result of Defendants' violations of the Texas Securities Act. As such, Plaintiffs are entitled to all remedies available under the Texas Securities Act, including rescission or, if rescission is not available, damages at law or in equity.

123. Defendants' wrongful conduct and undisclosed compensation arrangements were inherently self-concealing, and Defendants took affirmative steps to prevent Plaintiffs from discovering the misconduct. As a result, limitations are tolled under the discovery rule and the doctrine of fraudulent concealment.

**COUNT IV**
**BREACH OF CONTRACT**
**(against all Defendants)**

124. Plaintiffs repeat and hereby reallege the allegations above as if fully set forth herein.

125. Defendants entered into a valid contract under which they agreed to provide conflict-free and fiduciary-level services to Plaintiffs in exchange for substantial advisory fees.

126. While Plaintiffs fulfilled their obligations under the contract, Defendants failed to perform as promised. Specifically, Defendants failed to provide conflict-free and fiduciary-level services, failed to disclose material conflicts of interest, and failed to act in Plaintiffs' best interests.

127. As such, Plaintiffs seek all available remedies as the result of Defendants' breach of contract, including but not limited to, actual damages, and reasonable and necessary attorney's fees.

**COUNT V**
**NEGLIGENCE**
**(against all Defendants)**

128. Plaintiffs repeat and hereby reallege the allegations above as if fully set forth herein.

129. Defendants are liable to Plaintiffs under common law negligence under Texas law.

130. As paid investment advisers, Defendants owed Plaintiffs a duty of ordinary care in the performance of their advisory services.

131. Defendants breached that duty of care when they failed to act with the competence, diligence, and prudence required by a reasonably careful investment adviser.

Specifically, when they (1) recommended unsuitable products to Plaintiffs not in their best interests; (2) failed to disclose material information to Plaintiffs, which they had a duty to disclose; and (3) mismanaged portfolios' allocations.

132. Defendants' conduct was a direct, proximate, and producing cause of Plaintiffs' injuries and damages. Plaintiffs' injuries and damages were also reasonably foreseeable to Defendants.

133. Defendants are also liable to Plaintiffs under a professional negligence theory.

134. Defendants owed Plaintiffs a professional and fiduciary duty to act as a reasonable investment adviser would do under the same or similar circumstances.

135. Defendants breached their professional duty by committing the acts described in this Complaint.

136. Defendants are further liable to Plaintiffs for negligent misrepresentation.

137. In the course of their business as paid investment advisers, and in transactions in which they had a direct pecuniary interest, Defendants made numerous representations to Plaintiffs regarding the suitability of the investments they recommended to Plaintiffs and their purported advisory services.

138. Defendants recklessly provided misleading information to Plaintiffs, including but not limited to (1) representing that the Legacy Investments were appropriate, low-risk, and tax-advantageous without disclosing the significant IRS scrutiny and audit risks; (2) representing that life-insurance products were suitable for Nick despite his age, financial objectives, existing life-insurance coverage, and the availability of more appropriate investment options; and (3) representing that they provided conflict-free, fiduciary-level advice while concealing substantial commissions, referral fees, and other financial incentives from third

parties.

139. Defendants did not exercise reasonable care or competence in obtaining or communicating the information supplied to Plaintiffs. Instead, Defendants made recommendations without adequate due diligence, without a reasonable basis to believe the advice was suitable, and without disclosing material conflicts of interest or financial incentives influencing their advice. Plaintiffs justifiably relied on Defendants' representations in deciding to enter into the recommended investment products, advisory arrangements, and third-party agreements.

140. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs suffered pecuniary losses, including but not limited to investment losses, tax liabilities and penalties, and insurance-related costs.

## COUNT VI
## FRAUD AND FRAUDULENT MISREPRESENTATION
**(against all Defendants)**

141. Plaintiffs repeat and hereby reallege the allegations above as if fully set forth herein.

142. Defendants are liable to Plaintiffs for common law fraud under Texas law.

143. Defendants knowingly provided misleading information to Plaintiffs, including but not limited to (1) representing that the Legacy Investments were appropriate, low-risk, and tax-advantageous without disclosing the significant IRS scrutiny and audit risks; (2) representing that life-insurance products were suitable for Nick despite his age, financial objectives, and the availability of more appropriate investment options; and (3) representing that they provided conflict-free, fiduciary-level advice while concealing substantial commissions, referral fees, and other financial incentives from third parties.

144. These representations were made with falsity or reckless disregard of the truth.

145. Defendants had superior knowledge and access to information regarding the risks, commissions, conflicts of interest, and structure of the recommended investments and services. Plaintiffs in turn did not.

146. Defendants made these representations with the intent for Plaintiffs to rely upon them and act accordingly, including entering into the Legacy Investments, purchasing the PacLife insurance policies, engage CCK Strategies, and pay substantial advisory and management fees.

147. As a direct and proximate result of Defendants' misrepresentations, Plaintiffs suffered pecuniary losses, including but not limited to investment losses, tax liabilities and penalties, and insurance-related costs.

148. Defendants' wrongful conduct and undisclosed compensation arrangements were inherently self-concealing, and Defendants took affirmative steps to prevent Plaintiffs from discovering the misconduct. As a result, limitations are tolled under the discovery rule and the doctrine of fraudulent concealment.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY**
**(against all Defendants)**

149. Plaintiffs repeat and hereby reallege the allegations above as if fully set forth herein.

150. Defendants are liable to Plaintiffs for breach of fiduciary duty under Texas law.

151. As their investment advisers, Defendants were in a fiduciary relationship with Plaintiffs.

152. Defendants breached their fiduciary duties of care, loyalty, full disclosure, and utmost good faith by:

(1) misrepresenting the nature and risks of the Legacy Investments;

(2) failing to disclose the IRS scrutiny and audit history of conservation easements (despite later acknowledging that these types of investments have an almost 100% guaranteed risk of audit);

(3) failing to disclose the substantial commissions, referral fees, and financial incentives Defendants and the Ark Entities received from third parties;

(4) mismanaging Plaintiffs' accounts and policy allocations;

(5) representing that the investments were suitable, tax-advantaged, and aligned with Plaintiffs' objectives when they were not; and

(6) placing their own financial interests ahead of Plaintiffs' interests.

153. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs suffered pecuniary loss, including but not limited to investment losses, tax liabilities and penalties, and insurance-related costs.

154. Defendants' wrongful conduct and undisclosed compensation arrangements were inherently self-concealing, and Defendants took affirmative steps to prevent Plaintiffs from discovering the misconduct. As a result, limitations are tolled under the discovery rule and the doctrine of fraudulent concealment.

## PRAYER FOR RELIEF

Plaintiffs respectfully request an order and entry of judgment against Defendants as follows:

155. Awarding restitution to Plaintiffs in the amount of their investments;

156. Awarding punitive damages to Plaintiffs;

157. Awarding actual, direct, and compensatory damages to Plaintiffs;

158. Awarding interest at the maximum legal rate;

159. Declaring that Defendants have breached their fiduciary duty to Plaintiffs;

160. Awarding Plaintiffs their reasonable attorneys' fees, costs, and expenses in this action; and

161. Granting such other and further relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury as to all issues so triable.

Dated: December 31, 2025

*/s/ Gabriela Dubrocq*
Gabriela Dubrocq
Texas Bar No. 24146391

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 31, 2025, a true and correct copy of the foregoing document was filed with the Clerk of Court using CM/ECF.

*/s/ Gabriela Dubrocq*
Gabriela Dubrocq